Linda K. THOMAS and Garold D. Thomas, Plaintiffs,

v.

FCA US LLC, Defendant.

CIVIL NO. 4:15–cv–00424–SBJ

United States District Court,
S.D. Iowa, Central Division.

Signed 03/10/2017

Named Expert: Dr. James Michael Weaver, Ph.D., P.E., Dr. Jerry Lee Hall, Ph.D., P.E.

Jason S. Rieper, Rieper Law Office, Des Moines, IA, for Plaintiffs.

Richard A. Stefani, Gray Stefani & Mitvalsky, PLC, Cedar Rapids, IA, Susan Kathleen Allen, Terrence C. Thom, Stafford Rosenbaum LLP, Milwaukee, WI, for Defendant.

## ORDER DENYING FCA US LLC'S MOTION IN LIMINE TO EXCLUDE EXPERT TESTIMONY

STEPHEN B. JACKSON, JR., UNITED STATES MAGISTRATE JUDGE

### I. INTRODUCTION

Plaintiffs Linda K. Thomas and Garold D. Thomas initiated this action against defendant FCA US LLC ("FCA") after Linda was injured in a motor vehicle accident while driving a 2007 Chrysler Town & Country minivan. (Dkt. 1–3). According to Plaintiffs, the knee/leg airbag in Linda's minivan deployed upon impact with another vehicle and caused severe injuries to her legs. They contend FCA is liable for those injuries because the airbag assembly had a design defect and was not reasonably safe for its intended use, FCA failed to provide adequate warnings of the dangers of the airbag assembly, and FCA breached the implied warranty that the vehicle was fit for its intended use. In support of their claims, Plaintiffs designated two individuals as expert witnesses: James Weaver and Dr. Jerry Hall. (Dkt. 18).

Presently pending before the Court is a Motion in Limine to Exclude Expert Testimony of James Weaver and Dr. Jerry Hall (Dkt. 36) filed by FCA on November 21, 2016. FCA contends the proffered opinions of Mr. Weaver and Dr. Hall fail to meet the reliability and relevance standards for the admission of expert testimony and, as a result, they should be excluded as expert witnesses in this case. (Id. ¶ 11). In support of the motion, FCA filed a Memorandum of Authorities (Dkt. 36–1) and also relies upon a Statement of Undisputed Facts (Dkt. 36–2) and an Appendix (Dkt. 36–3) of materials submitted in support of FCA's Motion for Summary Judgment (Dkt. 37) filed on the same date.

Plaintiffs filed a Resistance to Motion in Limine to Exclude Expert Testimony (Dkt. 43) on January 2, 2017. They contend Mr. Weaver's and Dr. Hall's work in this matter satisfies the requisite standards for expert witnesses and, therefore, their proffered testimony should be allowed. Plaintiffs filed a combined Brief in Support of Resistance to Motion in Limine and Motion for Summary Judgment (Dkt. 43–1) and also rely upon their Response to Defendant's Statement of Undisputed Facts (Dkt. 43–2), their own Statement of Additional Material Facts (Dkt. 43–3), and an Appendix (Dkt. 45) of documents.

FCA filed a Reply Memorandum of Authorities in Further Support of Motion in Limine (Dkt. 49) on January 20, 2017. FCA also submitted a Response to Plaintiffs' Statement of Additional Material

Facts (Dkt. 49–1) and a Supplemental Appendix (Dkt. 49–2) of materials.

· Oral ·arguments were presented by counsel on both the Motion in Limine and the Motion for Summary Judgment on January 24, 2017. The summary judgment motion will be addressed by the Court in a separate order. For the reasons herein, the Motion in Limine will be denied.

## II. STANDARDS FOR ADMISSIBILITY OF EXPERT TESTIMONY

■ Pursuant to Federal Rule of Evidence 104(a), preliminary questions concerning the qualification of a person to be a witness and the admissibility of evidence shall be determined by the court. " 'The touchstone for the admissibility of expert testimony·is whether it will assist or be helpful to the trier of fact.' " *Lee v. Andersen*, 616 F.3d 803, 808· (8th Cir. 2010) (quoting *McKnight ex rel. Ludwig v. Johnson Controls, Inc.*, 36 F.3d 1396, 1408 (8th Cir. 1994)). Federal Rule of Evidence 702 governs. the admissibility of expert testimony and provides as follows:. .

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or · other specialized knowledge will help the trier of fact to understand· the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The rule reflects the principles of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), wherein the United States Supreme Court set forth standards for the admissibility of scientific expert testimony. The *Daubert* Court held that Rule 702 imposes a special gatekeeping obligation upon a trial judge to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* at 589, 113 S.Ct. 2786.

■ The Supreme Court later extended the application of these standards to testimony of engineers and other experts who are not scientists in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The *Kumho Tire* court explained that the standards are designed to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice· of an expert in the relevant field." *Id.* at 152, 119 S.Ct. 1167. " 'Rule 702 does not rank academic training over demonstrated practical experience.' " *David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1014 (8th Cir. 2012) (quoted citation omitted).

■ Accordingly, when considering expert testimony, the court must determine whether the testimony is both reliable and relevant. *See Barrett v. Rhodia, Inc.*, 606 F.3d 975, 980 (8th Cir. 2010)(quoting *Marmo· v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757.(8th Cir. 2006)); *Smith v. Bubak,* 643 F.3d 1137, 1140 (8th Cir. 2011) (same); *Polski v. Quigley Corp.*, 538 F.3d 836, 839 (8th Cir. 2008) (quoting *Lauzon v. Senco Products, Inc.*, 270 F.3d 681, 686 (8th Cir. 2001)); *J.B. Hunt Transport, Inc. v. General Motors Corp.*, 243 F.3d 441, 444 (8th Cir. 2001); *Weisgram v. Marley Co.*, 169 F.3d 514, 517 (8th Cir. 1999).

To satisfy the reliability requirement, the party offering the expert testimony . "must show by a preponderance of the

evidence both that the expert is qualified to render the opinion and that the methodology underlying his conclusions is scientifically valid." To satisfy the relevance requirement, the proponent must show that the expert's reasoning or methodology was applied properly to the facts at issue.

*Khoury v. Philips Med. Sys.*, 614 F.3d 888, 892 (8th Cir. 2010) (quoting *Barrett*, 606 F.3d at 980) (internal citations omitted).

■ Rule 702 has been characterized as " 'one of admissibility rather than exclusion.' " *Shuck v. CNH America, LLC*, 498 F.3d 868, 874 (8th Cir. 2007) (quoted citation omitted). " '[D]oubts regarding whether an expert's testimony will be useful should generally be resolved in favor of admissibility.' " *United States v. Finch*, 630 F.3d 1057, 1062 (8th Cir. 2011) (quoted citations omitted); *see also Marmo*, 457 F.3d at 758. " '[R]ejection of expert testimony is the exception rather than the rule.' " *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006) (quoting Fed. R. Evid. 702 advisory committee's note).

■ The primary concern of Rule 702 is the underlying principles and methodology utilized by the expert, rather than the expert's conclusions. *See Kuhn v. Wyeth, Inc.*, 686 F.3d 618, 625 (8th Cir. 2012); *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001). Factors bearing on the admissibility of expert evidence include

(1) whether the theory or technique applied can be tested, (2) whether the theory or technique has been subject to peer review and publication, (3) the known or potential rate of error, and (4) whether it is accepted in the relevant discipline.

*Kuhn*, 686 F.3d at 625 (citing *Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786); *see also Ahlberg v. Chrysler Corp.*, 481 F.3d 630, 635 (8th Cir. 2007) (listing same factors; citing *Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786); *Pro Serv. Auto., L.L.C. v. Lenan Corp.*, 469 F.3d 1210, 1216 (8th Cir. 2006) (listing same factors; quoting *Smith v. Cangieter*, 462 F.3d 920, 923 (8th Cir. 2006) (citing *Daubert*, 509 U.S. at 592–94, 113 S.Ct. 2786)).

These factors are not exclusive, however, and they need not be considered in every case because, "[o]f course, the *Daubert* reliability factors should only be relied upon to the extent that they are relevant and the district court must customize its inquiry to fit the facts of each particular case."

*Shuck*, 498 F.3d at 874 (quoting *Jaurequi v. Carter Mfg. Co.*, 173 F.3d 1076, 1083 (8th Cir. 1999) (internal citations omitted)). For example, in some situations, "observations coupled with expertise generally may form the basis of an admissible expert opinion." *Id.* (finding no abuse of discretion in district court's admission of challenged testimony where experts did not test components at issue).

■ Other factors the court may consider include " 'whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case.' " *Presley v. Lakewood Eng'g & Mfg. Co.*, 553 F.3d 638, 643 (8th Cir. 2009) (quoting *Sappington v. Skyjack, Inc.*, 512 F.3d 440, 449 (8th Cir. 2007) (quoting *Lauzon*, 270 F.3d at 686–87)). "While weighing these factors, the district court must continue to function as a gatekeeper who 'separates expert opinion evidence based on "good grounds" from subjective speculation that masquerades as scientific knowledge.' " *Id.* (quoting *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001)).

"Generally, 'the factual basis of an expert opinion goes to credibility of the testimony, not admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.' " *David E. Watson*, 668 F.3d at 1014 (quoting *Nebraska Plastics, Inc. v. Holland Colors Americas, Inc.*, 408 F.3d 410, 416 (8th Cir. 2005)); *see also United States v. Coutentos*, 651 F.3d 809, 820 (8th Cir. 2011); *Cole v. Homier Dist. Co.*, 599 F.3d 856, 865 (8th Cir. 2010); *Archer Daniels Midland Co. v. Aon Risk Servs., Inc.*, 356 F.3d 850, 858 (8th Cir. 2004). As recognized by the Eighth Circuit, "[e]xpert opinion necessarily involves some speculation." *Weitz Co. v. MH Washington*, 631 F.3d 510, 528 (8th Cir. 2011) (citing *Group Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753, 760 (8th Cir. 2003)). " 'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.' " *Kuhn*, 686 F.3d at 625 (quoting *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786).

On the other hand, " '[e]xpert testimony is inadmissible where ... it is excessively speculative or unsupported by sufficient facts.' " *Onyiah v. St. Cloud State Univ.*, 684 F.3d 711, 720 (8th Cir. 2012) (quoting *Barrett*, 606 F.3d at 981); *see also Marmo*, 457 F.3d at 757 ("Expert testimony is inadmissible if it is speculative, unsupported by sufficient facts, or contrary to the facts of the case."); *J.B. Hunt*, 243 F.3d at 444 (" 'Expert testimony that is speculative is not competent proof and contributes nothing to a legally sufficient evidentiary basis.' ") (quoting *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000) (internal quotations omitted)).

An expert's opinion should be excluded if it " 'is so fundamentally unsupported that it can offer no assistance to the jury.' " *Cole*, 599 F.3d at 865 (quoted citations omitted); *see also David E. Watson*, 668 F.3d at 1014 (quoting *Nebraska Plastics*, 408 F.3d at 416); *Coutentos*, 651 F.3d at 820 (quoting *Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1061 (8th Cir. 2002)); *Weitz Co.*, 631 F.3d at 527; *Meterlogic, Inc. v. KLT, Inc.*, 368 F.3d 1017, 1019 (8th Cir. 2004). In the words of the Supreme Court,

> nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*General Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *see Kuhn*, 686 F.3d at 625 (quoting *Joiner*, 522 U.S. at 146, 118 S.Ct. 512); *Junk v. Terminix Int'l Co.*, 628 F.3d 439, 448 (8th Cir. 2011) (same); *Pro Serv. Auto.*, 469 F.3d at 1216 (same); *Cangieter*, 462 F.3d at 924 (same); *Marmo*, 457 F.3d at 758 (same); *J.B. Hunt*, 243 F.3d at 444 (same).

In some instances, however, "it might be important 'for an expert to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case ....' " *Coutentos*, 651 F.3d at 821 (quoting Fed. R. Evid. 702 advisory committee's note). "This general testimony must 'address a subject matter on which the factfinder can be assisted by an expert.' " *Id.* " 'Where the subject matter is within the knowledge or experience of lay people, expert testimony is superfluous.' " *Id.* (quoted citation omitted).

Finally, "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704. However, "[o]pinions that 'merely tell the jury what result to reach' are" inadmissible. *Lee*, 616 F.3d at 809 (quoting Fed. R. Evid. 704

advisory committee's note). "[E]xpert testimony on legal matters is [also] not admissible. Matters of law are for the trial judge, and it is the judge's job to instruct the jury on them." *Southern Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003) (internal citation omitted); *see also Walsh v. Principal Life Ins. Co.*, 266 F.R.D. 232, 238 (S.D. Iowa 2010) (quoting *Southern Pine Helicopters*).

## III. PLAINTIFFS' DESIGNATED EXPERTS & PROFFERED OPINIONS

Plaintiffs designated James Weaver and Dr. Jerry Hall from Ames Forensic Engineers ("AFE") in Ames, Iowa, as expert witnesses for possible use at trial. (Dkt. 18). Their proffered opinions focus on the air bag assembly identified as an inflatable knee blocker ("IKB") which deployed in the 2007 Town & Country minivan driven by Linda Thomas upon impact with another vehicle on September 29, 2013. In their opinion, the design of the IKB is unreasonably dangerous and is likely to cause harm to the driver's lower legs during deployment. They further concluded, *inter alia*, that the design defects are directly responsible for the severe injuries suffered by Mrs. Thomas. In addition, they found no written warnings of the potential for leg injuries during the deployment of the IKB which, in their opinion, is in violation of national standards.

### A. Qualifications of Mr. Weaver & Dr. Hall

James Weaver is a Mechanical Engineer with a Bachelor of Science degree in Mechanical Engineering from Cleveland State University. (Weaver Aff. p. 1 (Dkt. 45)). He has Professional Engineering licenses from Iowa and Colorado and has practiced as a Mechanical Engineer since 1972 and as a Professional Engineer since 1977. (*Id.*). He is currently a practicing partner and President of AFE. (*Id.*). Mr. Weaver has been trained, certified and employed as an accident investigator and reconstructionist since 2008, and has testified in court and given sworn testimony in the field on multiple occasions. (*Id.*). He describes his experience as including "the inspection and analysis of multiple motor vehicle accidents, including the inspection of deployed air bags. In addition to incident causation, these investigations typically included a determination of occupant injuries and whether seat belts were in use." (*Id.* pp. 1–2). As a mechanical engineer, he has "provided both alternative mechanical designs and [has] designed and drafted appropriate warning labels as per ANSI Z535 standards." (*Id.* p. 2.).

As acknowledged during a deposition, this was Mr. Weaver's first case dealing with an IKB and he is not a biomechanical engineer. (Weaver Dep. Tr. p. 11 (Dkt. 36–3)). He has never been involved in the design of an air bag, IKB, or occupant restraint system for a passenger vehicle, and has never testified in a case where the goal was to address the design of an air bag in an automobile. (*Id.* pp. 20–21). He has never been employed by an automobile manufacturer or a component part supplier. (*Id.* p. 21). Mr. Weaver reviewed the Federal Motor Vehicle Safety Standards 208 to determine the requirements for air bags in the minivan at issue, plus read internet forums on IKBs, and testified he understands their function and how they are supposed to operate. (*Id.* pp. 22–23). He did not read any articles published by researchers who worked on the development or design of IKBs. (*Id.* p. 23). Mr. Weaver has not drafted a proposed warning for an automobile manufacturer but indicated AFE has done so for combines, motorboats, and trucks. (*Id.* p. 75).

Jerry Hall has a Bachelor of Science degree and a Master of Science degree in

Mechanical Engineering, and a Doctorate degree in Mechanical and Aerospace Engineering, all from Iowa State University. (Hall Aff. p. 1 (Dkt. 45)). Dr. Hall is a Professor Emeritus in the Department of Mechanical Engineering at the University after teaching various mechanical engineering principles for over 37 years. (*Id.*). He is licensed as a Professional Engineer in Iowa and Illinois, and has practiced as a Mechanical Engineering consultant since 1968. (*Id.* p. 2). He is currently a partner and Vice President of AFE with over 40 years of accident analysis and reconstruction experience, and has been trained and certified in the use of accident reconstruction software. (*Id.*). He also has had training and experience in the design of warning labels, and has designed warning labels pursuant to standards such as ANSI Z535. (*Id.*). He has testified in court and given sworn testimony on multiple occasions regarding accident analyses and reconstruction, and hazard warning. (*Id.*)

As with Mr. Weaver, this is also the first case for Dr. Hall involving an IKB. (Hall Dep. Tr. pp. 10–11 (Dkt. 36–3)). During his deposition, Dr. Hall acknowledged he has never designed an air bag or air bag component system but testified he has the background to do it. (*Id.* p. 10). He had not previously disassembled an IKB, but has disassembled other air bags. (*Id.* p. 11). He has not designed a warning for an automobile but has "designed several warnings" for other products including air compressors and blowers, and gas water heaters and furnaces. (*Id.* p. 15). Dr. Hall does not consider himself to be a biomedical expert but testified he has expertise in mechanical engineering, which includes kinematics and dynamics, and accident reconstruction. (*Id.* pp. 17–18).

## B. Methodology & Reports of Mr. Weaver & Dr. Hall

Dr. Hall and Mr. Weaver first inspected the 2007 Town & Country minivan in-volved in the accident at a secure storage building owned by Plaintiffs on January 22, 2016. During the inspection, multiple photographs were taken to document the condition of the minivan. A second inspection of the minivan occurred on March 9, 2016, at a dealership in Ames, Iowa, which allowed for the vehicle to be lifted for inspection. Multiple photographs also were taken during this inspection including by John Hinger of Hinger Engineering, a designated expert of FCA who was present along with Mr. Weaver. (*See* Hinger 8/5/2016 Report p. 4 (Dkt. 37–3)).

Dr. Hall and Mr. Weaver prepared a report dated May 31, 2016, describing their "preliminary observations and opinions concerning the injuries to" Linda Thomas from the September 29, 2013 accident. (AFE 5/31/2017 Report p. 1 (Dkt. 37–3)). The report contained, in part, the following initial analysis:

> During the inspections, AFE personnel observed that both the passenger and driver side airbags, as well as the IKB airbag had deployed. The cover assembly for the IKB airbag was inspected and photographed. It was noted that the cover assembly plate consisted of a molded outer plastic cover connected to an inner metal plate component. The edges of these IKB cover plates were sufficiently sharp, when deployed, to cause cuts, gouges and bruises to the legs of the vehicle driver. All three airbags: left-hand steering wheel airbag, right-hand passenger dashboard airbag and the IKB airbag would be propelled with considerable force during emergency deployment. However, only the IKB assembly has heavy components with rigid edges that could cause injuries. The design of the IKB specifically propels the cover assembly into the legs of the driver during deployment.

In the view of these investigators, the IKB covers, when propelled into a driver's legs during emergency deployment, pose an unreasonable, dangerous and hidden hazard to the driver. The factory design is defective as it includes components that cause cutting, gouging and/or bruising injuries during normal and expected operation. A principle of good safety design requires a safety device such as the IKB to not present an additional hazard by virtue of its design. In this case the IKB airbag cover provided a hazard that was both dangerous and hidden from view of the vehicle operator. Furthermore, there was no warning(s) provided to alert the vehicle operator about the hidden hazard and the potential for injury during a motor vehicle accident. Warnings should have been provided consistent with the American National Standards Institute (ANSI) Z535 Standards. In addition, the IKB airbag system may be defective by deploying with too much force. If the IKB airbag covers were designed to hinge rather than to completely pop out during IKB airbag deployment, then the IKB airbag system and its deployment are also defective.

(*Id.* pp. 4–5). It was noted that Dr. Hall and Mr. Weaver had "not been provided design drawings, circuit diagrams, design changes or other pertinent information requested pertaining to the IKB airbag." (*Id.* p. 5). The May 31, 2016 report concluded with a detailed "investigative plan" of further research and testing to be performed after review of additional materials. (*Id.* pp. 7–8).

A supplemental report was prepared by Dr. Hall and Mr. Weaver with a date of August 1, 2016, to describe their continued research and testing, which was summarized as follows:

the review and analysis of approximately 4000 pages of discovery materials supplied by FCA; the review of Answers to Interrogatories; the inspection of a fully-functioning exemplar 2007 Town and Country (T&C) minivan; the purchase, inspection and testing of a 2007 exemplar IKB; the purchase and inspection of an IKB taken from a salvage 2012 T&C; and the inspection of the IKB assembly on a fully-functioning 2012 T&C.

(AFE 8/1/2016 Supplemental Report pp. 1–2 (Dkt. 37–3)). After inspecting the subject IKB and an exemplar 2007 IKB, Dr. Hall and Mr. Weaver found that, "during deployment, the lower metal plate and the outer plastic cover of the 2007 IKB must be forced against the legs of the driver as the air bag explodes." (*Id.* p. 5). Based upon their research, they also found that "T&C minivans were not equipped with IKBs from 2008 to 2010." (*Id.*). Upon inspection of an IKB from a 2012 Town & Country minivan, they "noted the design of the 2012 IKB assembly is completely different from that of the 2007 IKB assembly." (*Id.* p. 6). Those differences, as specified in the report, include that "only the bag fabric contacts the driver's legs during deployment of the 2012 IKB, unlike the 2007 IKB assembly." (*Id.*). They further explain that, in a 2012 Town & Country minivan,

the perforated black plastic door opens, hinging at the front, and allows the bag to deploy rearwards against the driver's legs. Neither the black plastic cover nor the tan dashboard panel are forced against the driver's leg during IKB deployment.

(*Id.* pp. 9–10). In their opinion, "[t]his design ... greatly reduces the likelihood of leg lacerations and deep bruising from contact with plastic components." (*Id.* p. 10).

Dr. Hall and Mr. Weaver "developed a test procedure to determine the potential damage to a driver's legs during deployment" of the 2007 IKB which was set forth

in their report in detail, with attached photographs, and recorded with a video camera. (*See id.* pp. 6–9). Portions of the test conducted on an exemplar 2007 IKB are described as follows:

> An exemplar driver subject of the same height and weight was placed in the driver's seat and requested to move the seat to a comfortable driving position. The subject was then requested to move the adjustable steering wheel to a comfortable driving position. Once the subject had adjusted the seat and steering wheel, her legs were photographed and measured to assess the clearance between the right leg and the dashboard . . . .
>
> 3″ PVC pipe was purchased to simulate the approximate diameter of the legs, while mimicking the hardness of the tibia bone near the front edge of the lower leg. . . . The lengths of the upper and lower PVC 'legs' were adjusted to place the lower legs in the same position as that of the test subject while she occupied the driver's seat.
>
> The test subject had a layer of muscle extending ½ inch beyond each tibia, i.e., toward the dashboard. Two large ham steaks of 1/2-inch thickness were purchased from a local grocer. Each was taped to the test legs with bright orange tape so as to be visible during the video. Each ham steak was left inside its original package to simulate the resistance of the subject's skin and to prevent ham material from being flung away from the test legs during deployment.

(*Id.* pp. 7–8). The exemplar 2007 IKB was then activated via wire connected to a battery and "deployed instantly." (*Id.* p. 8).

After deployment, Dr. Hall and Mr. Weaver "examined the test legs and found significant crush damage to the ham steaks on both legs" described as follows:

> In particular, the meat covering the left knee joint showed evidence of heavy crushing, to the point of exposing the joints in the PVC pipe beneath the ham steak. A sharp corner of the plastic cover contacted the right leg, causing crush and penetration damage to the ham steak. Also, both test legs showed crush damage on the outer sides of the legs from being forced against the trim panel on the left side of the car and the left side of the plastic center console.

(*Id.* pp. 8–9).

Dr. Hall and Mr. Weaver reviewed the owner's manual for the Thomas' vehicle as to warnings regarding the air bag system and note the following:

> The existing warnings clearly stated the need to maintain clearance between the human body and the air bag(s).
>
> The existing warnings clearly stated the need to position small children in the rear seats of the vehicle.
>
> There were no warnings of the potential for leg injuries during the deployment of the driver's side IKB. This is a violation of American National Standards Institute (ANSI) Z–535 Standards.

(*Id.* p. 10). They further note that, in their opinion, the 2007 Chrysler Town & Country minivan would have complied with federal regulations "without the IKB system." (*Id.*).

At the end of the August 1, 2016 report, Dr. Hall and Mr. Weaver set forth the following conclusions:

> The plastic cover of the 2007 subject IKB will be forced against the driver's legs during air bag deployment, very likely causing injuries like those experienced by Mrs. Thomas.
>
> The design of the subject IKB is unreasonably dangerous and is likely to cause harm to the driver's lower legs during deployment.
>
> Chrysler was aware of the likelihood of the subject 2007 IKB causing leg inju-

ries and ceased installing driver-side IKB devices in the Chrysler Town and Country for Model Year 2008 through Model Year 2010. T&C vehicles for those three years have no IKB devices. In Model Year 2011, a completely different IKB system was installed in the T&C vehicle. This system uses a plastic box with perforated plastic cover to enclose the air bag fabric and igniter. Deployment of the air bag causes the cover to tear open and move aside, allowing the air bag fabric to deploy directly against the driver's leg.

The air bag warnings in the subject vehicle and owner's manual did not identify the IKB as a dangerous hazard and did not warn the owner or driver of action that might be taken to avoid such injury. Indeed, the vehicle driver would have no way to avoid possible injury during the IKB deployment.

At the date of this report, there is no evidence that Chrysler instituted a recall program to replace the defective and unreasonably dangerous IKB in Model Year 2007 and earlier vehicles.

These defects are directly responsible for the severe injuries suffered by Mrs. Thomas during the motor vehicle collision and her continued pain and suffering.

(*Id.* p. 11).

## IV. ANALYSIS

FCA contends Dr. Hall and Mr. Weaver should be precluded from testifying in this case pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), established Eighth Circuit precedent and Federal Rules of Evidence 104(a) and 702. (Dkt. 36). In its motion, FCA emphasizes that Dr. Hall and Mr. Weaver "have never worked on or investigated a case involving an IKB prior to this matter" and "did not consult or rely upon any established literature or publications relat-

ing to IKBs in developing their opinions." (*Id.* ¶¶ 8–9). FCA asserts their opinions are deficient in several respects including as follows:

A. Plaintiffs' experts have failed to identify any specific design defect in the 2007 Chrysler Town & Country.

B. Plaintiffs' experts fail to address, let alone establish, any causal connection between the IKB and Plaintiffs' injuries.

C. Plaintiffs' experts have failed to specifically identify, evaluate and test in any manner a reasonable alternative design or demonstrate that an alternative design would have prevented Plaintiffs' injuries in this case.

D. In developing their opinions, Plaintiffs' experts relied upon an untested and unreliable experiment that was designed solely for this litigation and which is not based on peer-reviewed literature or the scientific method.

E. Plaintiffs' experts have failed to identify any specific defect in the warnings provided by FCA US, nor have they identified and tested an alternative warning or demonstrate that an alternative warning would have prevented Plaintiffs' injuries.

(*Id.* ¶ 10). In the view of FCA, the opinions of Plaintiffs' designated experts fail to meet the *Daubert* standard, and as a result, they should be excluded as expert witnesses in this case. (*Id.* ¶ 11). FCA expounds upon those arguments within its supporting Memorandum of Authorities (Dkt. 36–1).

In resistance, Plaintiffs emphasize that Dr. Hall and Mr. Weaver "conducted significant research during their investigation and testing into the IKB to determine whether the product had a design defect which caused it to be unreasonably dangerous and whether it failed to warn the

end user of its inherently dangerous prospects." (Dkt. 43 ¶ 4). Plaintiffs note both individuals "have extensive education, experience, and training in all aspects of mechanical engineer[ing], in general, and accident reconstruction, specifically." (*Id.* ¶ 6). In Plaintiffs' view, Dr. Hall and Mr. Weaver "devised and conducted experimental testing based upon their theory that the IKB posed an unreasonable danger to drivers, like Mrs. Thomas," and "used widely accepted principles of engineering and conservative static testing in an attempt to determine whether their theory was supported by the evidence." (*Id.* ¶¶ 7–8). As a result, Plaintiffs contend the work of Mr. Weaver and Dr. Hall "satisfies the flexible requirements of *Daubert* and its progeny and their proffered testimony should be allowed in this matter." (*Id.* ¶ 10). Plaintiffs expound upon those arguments in their combined Brief in Support of Resistance to Motion in Limine and Motion for Summary Judgment (Dkt. 43–1).

After full consideration of the parties' submissions and arguments on the matter, and based upon the present pretrial evidentiary record, the Court finds insufficient grounds exist to preclude testimony or opinions which may be proffered by Mr. Weaver and Dr. Hall at the time of trial. Instead, the anticipated testimony of Dr. Hall and Mr. Weaver appears to be admissible expert testimony under Rule 702. First, both individuals have significant knowledge and expertise in mechanical engineering principles and accident analysis by their experience, training, and education as set forth in their curriculum vitae (Dkt. 18), reports (Dkt. 36–3), affidavits (Dkt. 45) and deposition testimony (Dkt. 36–3, 45). As such, they are, in general terms, amply qualified to testify as experts as to those subjects. *See* Fed. R. Evid. 702; *Kozlov v. Associated Wholesale Grocers, Inc.*, 818 F.3d 380, 394 (8th Cir. 2016) (professional registered engineer with

bachelor's and master's degrees in civil engineering "qualifies as an expert").

In addition, this Court is satisfied that their specific knowledge and expertise will likely help the jury, as trier of fact, to understand certain evidence and determine certain facts expected to be in issue at trial for this particular case. *See* Fed. R. Evid. 702 (a). As stated simply by Plaintiffs, Dr. Hall's and Mr. Weaver's "observations and results of their test would aid a jury in understanding the principles and operation of the IKB, and of its potential hazards upon deployment." (Dkt. 43–1 p. 6). The Court agrees.

Notwithstanding their education and experience in mechanical engineering and accident analysis, FCA argues Dr. Hall and Mr. Weaver "are not qualified to provide expert opinions regarding design defects, alternative design, warnings or causation" in this case. (Dkt. 36–1 p. 2). In doing so, FCA emphasizes what is missing from their credentials:

> Mr. Weaver and Dr. Hall have never been involved in the design or manufacture of an airbag for an automobile. They have never designed an occupant restraint system or its components for a passenger vehicle. They have never designed an inflatable knee blocker ("IKB"). Neither Mr. Weaver nor Dr. Hall has written any articles or authored any papers about airbags or IKB, and neither has reviewed or relied upon any articles published by any researchers who worked on the development or design of IKBs. Indeed, when it comes to the design of motor vehicles, airbag systems or inflatable knee blockers, Mr. Weaver and Dr. Hall have done nothing in that regard the entire course of their careers!

(*Id.*) The Court has considered those suggested shortcomings but is not persuaded such deficiencies are sufficient, under the

particular circumstances of this case, to preclude either Dr. Hall or Mr. Weaver from testifying in any manner at trial as requested by FCA in the pending motion.

For example, while authorship or publication of articles or papers may be a significant factor in some cases, it carries minimal weight given the facts and legal claims at issue here. In its Reply Memorandum (Dkt. 49), FCA chastises Plaintiffs' characterization of *Daubert* as a "flexible" analysis. (Dkt. 49 p. 2.) It is well-established, however, that "it is a flexible, case-specific inquiry." *American Auto. Ins. Co. v. Omega Flex, Inc.*, 783 F.3d 720, 723 (8th Cir. 2015); *see also Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1011 (8th Cir. 2005) ("inquiry is meant to be flexible and fact specific, and a court should use, adapt, or reject *Daubert* factors as the particular case demands"). Indeed, the *Daubert* Court itself explicitly stated: "The inquiry envisioned by Rule 702 is, we emphasize, a flexible one." *Daubert*, 509 U.S. at 594, 113 S.Ct. 2786. Removing any doubt, the *Kumho Tire* Court later confirmed, in addressing the testimony of engineers, that

> a trial court *may* consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability. But, as the Court stated in *Daubert*, the test of reliability is "flexible," and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case.

*Kumho Tire*, 526 U.S. at 141, 119 S.Ct. 1167. Here, in this particular case, the Court finds neither the lack of authorship of articles on IKBs, nor lack of reliance upon published articles on IKBs, to be a significant factor when examining the qualifications of Dr. Hall and Mr. Weaver as potential expert witnesses under Rule 702.

Although a lack of experience in the actual designing of airbags or IKBs is a more pertinent factor, it still does not rise

to the level, in this Court's opinion, sufficient to preclude Dr. Hall and Mr. Weaver from presenting any testimony in this particular case. As suggested by Plaintiffs, it was not necessary for their designated experts to design an alternative airbag because, in their view, FCA "already had viable alternatives to the [2007] IKB" as evidence by the absence of an IKB in its 2008 to 2010 model minivans and by the design of the IKB in its 2011 model minivans "which eliminated the risk of lower leg injury from IKB cover impact." (Dkt. 43–1 pp. 9–10). Based on the knowledge and expertise shown to be possessed by Dr. Hall and Mr. Weaver, along with their research, observations and overall work conducted for this specific case, it appears they are qualified to assist the jury in understanding the operation of the 2007 IKB, and its potential hazards upon deployment, along with understanding the operation of the 2011 IKB, and its elimination of those potential hazards, without actual experience in designing an IKB themselves. Ultimately, those matters raised by FCA are for the jury to consider in determining the credibility to be given Dr. Hall and Mr. Weaver as experts, and in assessing their opinions. *See American Auto.*, 783 F.3d at 726 (" 'Gaps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility.' " (quoting *Robinson*, 447 F.3d at 1100 (quotation omitted))).

The Court also finds that the anticipated testimony to be presented by Dr. Hall and Mr. Weaver, under the present record, appears to be based on sufficient facts as to the particular circumstances of this case, and is the product of reliable principles and methods which Dr. Hall and Mr. Weaver reliably applied to those facts. *See* Fed. R. Evid. 702 (b), (c), (d). In general, the statements and opinions set forth in their written reports are not so excessively

speculative or unsupported by facts to warrant exclusion from presentation at trial. Nor does the Court find their underlying methodology to be scientifically invalid as urged by FCA.

FCA vehemently challenges the testing conducted by Dr. Hall and Mr. Weaver as "a wholly unreliable experiment using ham steak and PVC pipe held down by wooden boards and weights to replicate human legs." (Dkt. 36–1 p. 2). FCA points out that, prior to this case, Dr. Hall and Mr. Weaver "had never developed a test procedure to determine potential damage to a driver's legs during deployment of an airbag or IKB" and "they had never seen a similar experiment published in any peer-reviewed literature." (*Id.* p. 3). In the view of FCA, "the ham steak and PVC pipe experiment was developed solely for this litigation, but with total disregard for the facts and forces at play in the underlying accident." (*Id.*).

Specifically, FCA argues Dr. Hall and Mr. Weaver failed to consider Linda Thomas' actual location within the minivan at the time of the accident, which is a critique of their testing procedure by FCA's own designated expert, Mr. Hinger. (*Id.* pp. 6–8). FCA further argues that Dr. Hall and Mr. Weaver "disregarded" the laws of physics as compared to FCA's own experts who "took the entire spectrum of forces involved in the crash into consideration when conducting their analyses." (*Id.* pp. 8–9). FCA further challenges the testing as "improperly results-driven." (*Id.* pp. 10–11).

In response, Plaintiffs contend FCA "misunderstood" the goal of the experiment which "was to determine if a typical woman driver's leg(s) would be contacted/impacted and injured by the rigid IKB plastic cover during deployment of the air bag components in the subject vehicle, even under very conservative test conditions." (Dkt. 43–1 p. 11). As such, Plaintiffs

"agree that the placement of the PVC pipe legs did not model Mrs. Thomas' exact position in the vehicle at the instant of IKB deployment" which, in their view, "could not be exactly determined by any party in this action." (*Id.*). Plaintiffs further explain:

> The sole purpose of the aforementioned experiment was to confirm or disprove the hypothesis that the IKB cover was capable of contacting and potentially injuring the lower legs of a driver when the IKB air bag system was deployed, and that said contact was capable of bending/distorting the inner metal cover of the IKB assembly. The employment of this test method was not to perfectly mimic the action of the IKB air bag system on Mrs. Thomas during a collision, but to determine if the legs of a typical female driver could be contacted during a very conservative test. [Mr.] Weaver and Dr. Hall did not intend this experiment to stand alone, but to act as part of the foundation in reaching their conclusions.

(*Id.* p. 12). In retort to FCA's assertions, Plaintiffs contend the purported analysis of "the entire spectrum of forces involved in the crash" utilized by FCA's designated experts relies upon speculative assumptions as opposed to proper engineering data. (*Id.* pp. 12–13).

After considering the various challenges FCA raises against the testing performed by Dr. Hall and Mr. Weaver in this case, and Plaintiffs' response thereto, the Court finds the alleged deficiencies in their methods are not sufficient to preclude either individual from testifying at trial as requested in the pending motion. Notably, the utilization of different assumptions and methods by FCA's own designated experts in reaching counter opinions does not warrant exclusion of Plaintiffs' proffered expert testimony. As

instructed by the Eighth Circuit, " 'mere disagreement with the assumptions and methodology used does not warrant exclusion of expert testimony.' " *David E. Watson*, 668 F.3d at 1015 (quoting *Synergetics, Inc. v. Hurst*, 477 F.3d 949, 956 (8th Cir. 2007)); *S.E.C. v. Das*, 723 F.3d 943, 951 (8th Cir. 2013) (same). Instead, criticism between otherwise qualified experts is "grist for the jury." *EFCO Corp. v. Symons Corp.*, 219 F.3d 734, 739 (8th Cir. 2000) (district court did not abuse its discretion by allowing plaintiff's expert who possessed adequate credentials to testify where defendant's expert, who disputed plaintiff's expert's methodology, also testified; jury left with "ultimate decision as to which theory was the sounder").

While FCA may have some valid criticism of the factual basis for their testing procedures, those alleged deficiencies are for the jury to hear and weigh in consideration of the testimony actually provided by Dr. Hall and Mr. Weaver at trial. As repeatedly noted by the Eighth Circuit, " 'the factual basis of an expert opinion goes to credibility of the testimony, not admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.' " *David E. Watson*, 668 F.3d at 1014 (quoting *Nebraska Plastics, Inc.*, 408 F.3d at 416); *see also, e.g., Acosta v. Acosta*, 725 F.3d 868, 874 (8th Cir. 2013) (challenge to factual basis "goes to the credibility of the expert testimony, rather than its admissibility"). Contrary to FCA's suggestion, the statements and opinions set forth in the reports of Dr. Hall and Mr. Weaver do not appear to be "so fundamentally unsupported that it can offer no assistance to the" jury thereby requiring exclusion. *Id.*

The Court reaches the same conclusion in regard to FCA's challenges to the expected testimony of Dr. Hall and Mr. Weaver as to the lack of warning of potential leg injuries from deployment of the 2007 IKB. (*See* Dkt. 36–1 pp. 18–19). Based upon the current record, it appears Dr. Hall and Mr. Weaver have sufficient training and experience in the design of warning labels, and knowledge as to standard warning requirements applicable here, to assist the jury to understand the evidence and determine facts related to Plaintiffs' claims on the warning issue. To the extent FCA believes there are deficiencies in their qualifications or knowledge, those matters are for the jury to consider in determining the credibility to be given Dr. Hall and Mr. Weaver as experts on the subject of warnings in this case, and weighing any testimony or opinions proffered at trial.

## V. CONCLUSION & ORDER

Based upon the present pretrial evidentiary record before the Court, defendant FCA US LLC has not established sufficient grounds for precluding Plaintiffs' designated expert witnesses James Weaver and Dr. Jerry Hall from testifying at trial in this matter. Instead, at this pretrial stage, the anticipated testimony of those individuals in general appears to be sufficiently reliable and relevant under the standards of Federal Rule of Evidence 702 and precedential case law progeny of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Therefore, the Motion in Limine to Exclude Expert Testimony of James Weaver and Dr. Jerry Hall (Dkt. 36) shall be, and is hereby, denied. James Weaver and Dr. Jerry Hall will be allowed to testify at trial subject to the evidentiary record and any appropriate objections raised and sustained as to the actual testimony to be presented to the jury.

IT IS SO ORDERED.